UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| BRIAN K. HALL<br>1489 Stonegate Court<br>Temperance, Michigan 48182<br><br>And<br><br>MICHAEL G. THOMPSON<br>2704 Discovery Drive<br>Plainfield, Illinois 60586.<br><br>       Plaintiffs,<br><br>-vs-<br><br>EDGEWOOD PARTNERS INSURANCE<br>CENTER, INC.<br>c/o Statutory Agent<br>National Registered Agents, Inc.<br>1300 East Ninth Street<br>Cleveland, Ohio 44114<br><br>       Defendant. | Case No. _____<br><br>Judge _____<br><br>**COMPLAINT FOR DECLARATORY JUDGMENT** |

\* \* \*

Now come Plaintiffs Brian K. Hall ("Hall") and Michael G. Thompson ("Thompson") (collectively, "Plaintiffs"), by and through their counsel, and for their Complaint against Defendant Edgewood Partners Insurance Center, Inc. ("EPIC") allege as follows:

## INTRODUCTION

1. Pursuant to 28 U.S.C. § 2201(a) and Rule 57 of the Federal Rules of Civil Procedure, Plaintiffs bring this declaratory judgment action against EPIC to ascertain their rights

under the employment agreements they executed with EPIC's predecessor, USI Insurance Services, LLC ("USI"), as well as any other obligations Hall and Thompson may owe EPIC.

2. Specifically, Plaintiffs seek guidance from the Court as to the scope of the restrictive covenants contained in their employment agreements, most notably whether EPIC has a legitimate interest in Plaintiffs' pre-existing and personal clients that were neither created nor maintained at EPIC's expense.

**PARTIES**

3. Hall is an individual who currently resides at 1489 Stonegate Court in Temperance, Michigan.

4. Thompson is an individual who currently resides at 2704 Discovery Drive in Plainfield, Illinois.

5. Defendant EPIC is a California corporation that is licensed to do business in Ohio and regularly conducts business in the State of Ohio and within this judicial district. Upon information and belief, EPIC has its principal place of business 2000 Alameda de las Pulgas, 101, San Mateo, California. EPIC recently acquired certain assets of Plaintiffs' former employer, USI, which conducts business within this judicial district.

**JURISDICTION AND VENUE**

6. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because there is complete diversity between Plaintiffs and Defendant EPIC and the amount in controversy exceeds $75,000, as detailed below.

7. This Court has personal jurisdiction over Defendant EPIC pursuant to R.C. §§ 2307.382(A)(1), (2), and (9) because they transacted business and contracted to and are licensed to sell insurance in the State of Ohio and within this judicial district.

8. Venue is appropriate in this judicial district under 28 U.S.C. § 1391(b)(3).

## FACTUAL AND LEGAL BACKGROUND

### A. Hall Employment Background

9. Hall began working in the insurance industry in January, 1988 when he joined RLM Insurance Agency ("RLM"), a Pompton Lakes, New Jersey insurance agency. During his employment with RLM, Hall sold commercial property and casualty insurance exclusively to the equipment rental industry in the States of Michigan, Ohio, Kentucky, and Tennessee.

10. In or around July 1990, Hall joined InterNational Rental Insurance ("IRI"), a San Clemente, California insurance agency. During his employment with IRI, Hall continued to market and sell insurance to equipment rental dealers throughout the United States.

11. In 1992, while still employed with IRI, Hall marketed to and gained a small truck rental company, On The Move, as a client. At the time On The Move began working with Hall, it had been in business for less than a year.

12. In or around December 1996, Hall resigned from IRI and, together with Thompson and another IRI employee, formed Hylant Specialty Programs ("HSP"). Prior to resigning from IRI, Hall's personal book of business had a value of at least $2,500,000.

13. During his tenure at HSP, Hall served as President of the agency and continued to sell and market property and casualty insurance to equipment rental dealers around the country. He also continued to act as the exclusive agent to On The Move, which followed him from IRI to HSP. In or around 1997, Hall also acquired Elms Equipment as a client. While at HSP, Hall's personal book of business was at least $3,000,000.

14. In April 2012, USI acquired certain assets from HSP pursuant to an Asset Purchase Agreement, effective as of April 13, 2012.

15. In addition to acquiring HSP's assets, USI hired Hall to serve as President of its USI Affinity Rental Specialties program. As a condition of employment, USI required Hall to execute an Employment Agreement ("Hall Agreement"). A true and accurate copy of the Hall Agreement is attached as Exhibit 1 and incorporated herein by reference.

16. As set forth in Exhibit 1, the Hall Agreement contained several restrictive covenants, including confidentiality, non-competition, and non-solicitation.

17. With respect to confidentiality, the Hall Agreement provided:

> ***Confidentiality During and Following Term.*** During the Term hereof, and for a five (5) year period following the Term, Executive will not use, or disclose to any Person, any Confidential Information (determined as of any date during the Term hereof) of any USI Company, except (a) in the normal course of business on behalf of the Company (b) with the prior written consent of such USI Company or (c) to the extent necessary to comply with law or the valid order of a court of competent jurisdiction, in which event Executive shall notify such USI Company as promptly as practicable (and, if possible, prior to the making of such disclosure). In addition, Executive will use reasonable efforts to prevent any such prohibited use or disclosure by any other Person.

(Exhibit 1, ¶ 5.3).

18. With respect to non-solicitation, the Hall Agreement provided:

> ***Non-Solicitation of Clients and Active Prospective Clients.*** On behalf of any Competitive Business, Executive shall not, without the Company's prior written consent, directly or indirectly:
>
> (i) (A) solicit, sell, provide or accept any request to provide insurance services in competition with the Company to any Client Account; or (B) consult for any Client Account with respect to insurance services in competition with the Company; or (C) sign or accept a broker of record letter with any Client Account; or (D) induce the termination, cancellation or non-renewal of any Client Account; and/or
>
> (ii) (A) solicit, sell, provide or accept any request to provide insurance services in competition with the Company to any Active Prospective Client; or (B) consult for any Active Prospective

Client with respect to insurance services in competition with the Company; or (C) sign a broker of record letter with any Active Prospective Client.

(Exhibit 1, ¶ 6.1(a)).

19. The Hall Agreement further specified that the non-solicitation restrictions concerning Client Accounts would remain in effect for two years following the termination of Hall's employment whereas the restrictions concerning Active Prospective Clients would remain in effect for only six months. (Exhibit 1, ¶ 6.1(b)).

20. With respect to non-competition, the Hall Agreement provided:

> ***Non-Competition.*** In consideration of the payments and benefits to be received by Executive under this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by Executive, Executive agrees that, during Executive's employment with the Company or its successors or assigns, Executive will refrain from carrying on any business, for the benefit of Executive or another Person, which provides any US1 Business in competition with the Company anywhere except (i) in the normal course of business on behalf of any USI Company during the term of Executive's employment under this Agreement or (ii) with the Company's prior written consent. Executive further agrees that, during the Non-Competition Period, Executive will refrain from carrying on any business, directly or indirectly, which provides any USI Business in competition with the insurance business of USI Affinity. The term "carrying on any business" shall mean to act as a sole proprietor, partner, member of a limited liability company, stockholder, officer, director, employee, manager, trustee, agent, advisor, joint venturer, or consultant of, with or to, any business, or otherwise to own, manage, operate, control or participate in the ownership, management, operation or control of, or engage in, any business. The Non-Competition Period shall mean the period beginning on the effective date of termination of Executive's employment with the Company or its successors or assigns, and ending six (6) months thereafter. It is expressly agreed that this Section 6.2 is not intended to restrict or prohibit the ownership by Executive of stock or other securities of a publicly-held corporation in which Executive (a) does not possess beneficial ownership of more than 5% of the voting capital stock of such corporation and (b) does not participate in any management or

> advisory capacity. In addition, it is also agreed that this Section 6.2 shall not prohibit Executive from serving as a director pursuant to the terms of Section 2.3 during the term of Executive's employment under this Agreement.

(Exhibit 1, ¶ 6.2).

21. In addition to the restrictive covenants, USI required Hall to cease marketing and selling insurance during his employment. USI did, however, permit Hall to continue as the exclusive agent for On The Move and set forth separate compensation terms for the account in the Hall Agreement. (Exhibit 1, ¶ 3.8). As of the date on which USI acquired HSP's assets, Hall had been On The Move's exclusive agent for more than twenty years.

22. The Hall Agreement further provided that it "shall be governed by and construed in accordance with the laws of the State of New York without regard to principles of conflicts of laws." (Exhibit 1, ¶ 14).

### B. Thompson Employment Background

23. Thompson began working in the insurance industry in 1988 when he joined RLM. During his employment with RLM, Thompson sold commercial property and casualty insurance exclusively to the equipment rental industry in the States of Illinois, Indiana, and Wisconsin.

24. In or around November 1990 or 1991, Thompson joined IRI where he continued to market and sell insurance to equipment rental dealers in the same geographic territory he occupied while employed by RLM.

25. In or around December 1996, Thompson resigned from IRI and, together with Hall and another IRI employee, formed HSP.

26. During his tenure at HSP, Thompson continued to sell and market property and casualty insurance to equipment rental dealers in in the same geographic territory he occupied while employed by RLM and IRI as well as in Virginia, West Virginia, Iowa, Minnesota,

Nebraska, North Dakota and South Dakota and a couple of accounts in Missouri, South Carolina, and Florida.

27. In April 2012, Thompson joined USI as a Senior Vice President following USI's acquisition of certain assets from HSP. As a condition of employment, USI required Thompson to execute an Employment Agreement ("Thompson Agreement"). A true and accurate copy of the Thompson Agreement is attached as Exhibit 2 and incorporated herein by reference.

28. As set forth in Exhibit 2, the Thompson Agreement contained several restrictive covenants, including confidentiality and non-solicitation.

29. With respect to confidentiality, the Thompson Agreement provided:

> ***Confidentiality During and Following Term***. During the Term hereof, and for a five (5) year period following the Term, Producer will not use, or disclose to any Person, any Confidential Information (determined as of any date during the Term hereof) of any USI Company, except (a) in the normal course of business on behalf of the Company (b) with the prior written consent of such USI Company or (c) to the extent necessary to comply with law or the valid order of a court of competent jurisdiction, in which event Producer shall notify such USI Company as promptly as practicable (and, if possible, prior to the making of such disclosure). In addition, Producer will use reasonable efforts to prevent any such prohibited use or disclosure by any other Person.

(Exhibit 2, ¶ 5.3).

30. With respect to non-solicitation, the Thompson Agreement provided:

> ***Non-Solicitation of Clients and Active Prospective Clients***. On behalf of any Competitive Business, Producer shall not, without the Company's prior written consent, directly or indirectly:
>
> (i) (A) solicit, sell, provide or accept any request to provide insurance services in competition with the Company to any Client Account or (B) consult for any Client Account with respect to insurance services in competition with the Company; or (C) sign or accept a broker of record letter with any Client Account; or (D) induce the termination, cancellation or non-renewal of any Client Account in each case, that Producer managed or regularly serviced

on behalf of the Company and/or about which Producer obtained Confidential Information on behalf of the Company in the two (2) years prior to the termination of the Producer's employment with the Company; and/or

(ii) (A) solicit, sell, provide or accept any request to provide insurance services in competition with the Company to any Active Prospective Client; or (B) consult for any Active Prospective Client with respect to insurance services in competition with the Company; or (C) sign a broker of record letter with any Active Prospective Client, in each case, that Producer solicited and/or about which Producer obtained Confidential information on behalf of the Company in the six (6) months prior to the termination of the Producer's employment with the Company.

(Exhibit 2, ¶ 6.1(a)).

31. The Thompson Agreement further specified that the non-solicitation restrictions concerning Client Accounts would remain in effect for two years following the termination of Thompson's employment whereas the restrictions concerning Active Prospective Clients would remain in effect for only six months. (Exhibit 2, ¶ 6.1(b)).

32. Like the Hall Agreement, the Thompson Agreement provided that it would "be governed by and construed in accordance with the laws of the State of New York without regard to principles of conflicts of law." (Exhibit 2, ¶ 11).

### C. EPIC Acquires USI

33. In or around December 2016 EPIC acquired certain assets of USI's equipment rental business, including, upon information and belief, the right to enforce the post-employment restrictive covenants in the Hall Agreement and the Thompson Agreement.

34. Around that same time, Hall and Thompson were advised that EPIC would continue to utilize their talents through May 2017, at which time they would become employees of EPIC. Specifically, with respect to Hall, EPIC represented that it intended for Hall to continue to manage his team of sales producers and service personnel.

35. Over the next few months, Hall and Thompson met and engaged in discussions with EPIC about the terms and scope of their prospective employment.

36. In March 2017, approximately one month after confirming that it intended to offer Hall an employment contract, EPIC informed Hall that it no longer intended to offer him a position in its equipment rental business and advised that the decision was effective immediately. EPIC provided no justification to Hall for its decision, but has since advised others that it wanted to "take out the trash" before it commenced operations of its rental business. An EPIC executive also referred to Hall as an "asshole" in front of several employees (USI sales producers, officer managers and several members of EPIC's management team).

37. After communicating its decision to Hall, EPIC authorized its attorneys to send him a letter in which EPIC made it clear that it would attempt to enforce the restrictive covenants contained in the Hall Agreement ("Hall Letter"). A copy of the Hall Letter is attached as Exhibit 3 and incorporated herein by reference.

38. EPIC eventually offered Thompson a position, but the offer required Thompson to accept a reduction in both compensation and benefits. The position also required Thompson to work with a former supervisor who in an open meeting recently hosted by EPIC referred to Thompson as an "asshole." Based on these considerations, Thompson advised EPIC that he would not execute its proposed employment agreement. EPIC terminated Thompson on April 14, 2017.

39. Thompson and Hall now desire to work with their personal and pre-existing clients and therefore seek guidance from the Court as to the scope and enforceability of the restrictive covenants in their employment agreements with respect to those clients.

### D. New York Law Governs the Hall and Thompson Agreements

40. As set forth in Exhibits 1 and 2, the Hall Agreement and the Thompson Agreement are governed by New York law.

41. New York strongly disfavors enforcement of post-employment restrictive covenants against former employees.

42. "As a general rule, 'New York courts disfavor restrictive covenants in the employment context and will generally enforce them only to the extent they are reasonable and necessary to protect valid business interests.'" *Banner Indus. of N.E., Inc. v. Wicks*, 631 F. App'x 79, 80 (2d Cir. 2016) (citing *Lucente v. Int'l Bus. Mach. Corp.*, 310 F.3d 243, 254 (2d Cir. 2002) and *BDO Seidman v. Hirshberg*, 93 N.Y.2d at 382, 388-89 (1999)).

43. New York "require[s] restrictive covenants to be reasonably limited in time, scope and geographical area, and to be grounded in a legitimate business purpose." *Brown & Brown, Inc. v. Johnson*, 25 N.Y.3d 364, 369 (2015).

44. A restrictive covenant will be enforced under New York law only "if it: (1) is no greater than is required for the protection of the legitimate interest of the employer, (2) does not impose undue hardship on the employee, and (3) is not injurious to the public." *BDO Seidman*, 93 N.Y.2d at 388-89 (citing *Reed, Roberts Assocs. v. Strauman*, 40 N.Y.2d 303, 307 (1976)).

45. The seminal case in this area is *BDO Seidman*. *BDO Seidman* specifically held that an employer does not have a legitimate interest in preventing a former employee from competing for the business of clients who came to the employer solely to avail themselves of the employee's services and only as a result of his or her own independent recruitment efforts, which the employer neither subsidized nor otherwise financially supported as part of a program of

client development, "[b]ecause the goodwill of those clients was not acquired through the expenditure of [the employer's] resources." *BDO Seidman*, 93 N.Y.2d at 388-89.

## COUNT I

### (Declaratory Judgment)

46. Plaintiffs reallege and incorporate paragraphs 1 through 45 above as if set forth herein.

47. Defendant EPIC claims that the restrictive covenants set forth in the Hall Agreement, which are substantially similar to if not the same as the restrictive covenants in the Thompson Agreement, are valid and enforceable and represented in the Hall Letter that it intends to "vigorously pursue all rights it have available to it" thereunder.

48. Hall and Thompson now desire to work with their personal and pre-existing clients and claim that the restrictive covenants are unenforceable with respect to those clients as Hall and Thompson developed them on their own and/or prior to EPIC's acquisition of USI.

49. There is a justiciable controversy between parties with adverse legal interests over whether the restrictive covenants are legal and enforceable and, thus, whether they preclude Hall and Thompson from working with their pre-existing and long standing clients.

50. Hall and Thompson have legal interests in the enforceability of the restrictive covenants because EPIC has threatened to commence legal action against Hall should he violate the restrictive covenants, including the confidentiality and non-solicitation provisions, contained in the Hall and Thompson Agreements. A declaratory judgment as to the enforceability of the restrictive covenants and any other obligations Hall and Thompson may owe EPIC would thus resolve a matter in controversy between the Parties.

51. Hall and Thompson are entitled to a declaratory judgment holding that the restrictive covenants are unenforceable with respect to the long standing clients that they developed on their own and/or prior to EPIC's acquisition of USI.

52. Hall and Thompson are entitled to a declaratory judgment declaring that they do not owe any other post-employment obligations to EPIC.

**WHEREFORE**, Plaintiffs Brian K. Hall and Michael G. Thompson respectfully request judgment as follows:

  A. Declaring that the restrictive covenants in the Hall Agreement and the Thompson Agreement are invalid and unenforceable with respect to the pre-existing and personal clients that Plaintiffs acquired prior to Defendant Edgewood Partners Insurance Center, Inc.'s acquisition of USI Insurance Services, LLC; and

  B. Declaring that Hall and Thompson owe no other obligations to Defendants Edgewood Partner Insurance Center, Inc.; and

  C. Awarding such other and further relief as the Court deems just and equitable.

Respectfully submitted,

*/s/Gregory H. Wagoner*
Gregory H. Wagoner (0076132)
Katherine S. Decker (0085600)
SHUMAKER, LOOP & KENDRICK, LLP
1000 Jackson Street
Toledo, Ohio 43604
Telephone: (419) 321-1206
Fax: (419) 241-6894
E-Mail: gwagoner@slk-law.com
kdecker@slk-law.com

Attorneys for Plaintiffs
Brian Hall and Michael Thompson

Date: April 17, 2017