## EMPLOYMENT AGREEMENT

EMPLOYMENT AGREEMENT ("Agreement"), by and between USI Insurance Services LLC, a Delaware limited liability company (the "Company"), and Brian Hall ("Executive) is effective as of the date of closing (the "Effective Date") of the transactions contemplated by the Asset Purchase Agreement (as defined below). The Company and Executive are collectively referred to hereinafter as the "Parties" and each individually, a "Party".

### R E C I T A L S:

WHEREAS, the Company is a wholly owned subsidiary of USI Holdings Corporation, a Delaware corporation ("USI"); and

WHEREAS, pursuant to the Asset Purchase Agreement (the "Asset Purchase Agreement") by and among Hylant Group, Inc., certain other sellers party thereto (collectively, the "Sellers") and the Company, the Company will purchase certain assets from the Sellers at the closing (the "Closing") of the transactions contemplated by the Asset Purchase Agreement; and

WHEREAS, conditioned upon and at the Closing, the Company desires to employ Executive on the terms and subject to the conditions set forth herein, and Executive is willing to accept such employment on such terms and conditions; and

WHEREAS, by virtue of such employment, Executive will have access to and be given Confidential Information of the USI Companies and will also have training and access to the Company's customers and suppliers; and

WHEREAS, Executive acknowledges and agrees that the Company (on behalf of itself and the USI Companies) has a reasonable, necessary and legitimate business interest in protecting its own and the USI Companies' Confidential Information, Client Accounts, relationships with Active Prospective Clients, Goodwill and ongoing business as well as assets purchased under the Asset Purchase Agreement, and that the terms and conditions set forth below are reasonable and necessary in order to protect these legitimate business interests.

NOW THEREFORE, in consideration of the recitals, representations, warranties, covenants, and agreements contained herein, and for other good and valuable consideration, the receipt and adequacy of which are conclusively acknowledged, the Parties, intending to become legally bound, agree as follows:

EXHIBIT 1

AGREEMENT:

## 1. DEFINITIONS

Capitalized terms not defined elsewhere herein shall have the following meanings ascribed to them, which the Company may modify from time to time:

"**Active Prospective Client**" means any Person, or a group of Persons, which in the six (6) months preceding the termination of Executive's employment, the Company or the Sellers, as the case may be, specifically identified in its records as a potential client or prospective broker referral source, in each case, that Executive solicited and/or about which Executive obtained Confidential Information on behalf of the Company in the six (6) months prior to the termination of the Executive's employment with the Company.

"**Client Account**" means the account of any broker referral source or client (including, without limitation, any retail insurance agent or broker, individual insured, association and any member thereof, and any insurance carrier or other entity to the extent third party administration claims processing or underwriting is performed by a USI Company for such carrier or other entity) who or which is serviced by a USI Company in connection with such USI Company's business, regardless of whether such services are provided by, or through the licenses of a USI Company or any shareholder, employee or agent of a USI Company and/or any client who or which was serviced by the Sellers in connection with the Sellers' business, in each case, that Executive managed or regularly serviced on behalf of the Company and/or about which Executive obtained Confidential Information on behalf of the Company in the two (2) years prior to the termination of the Executive's employment with the Company.

"**Competitive Business**" means any Person engaged in the production, distribution, marketing or sale of a Competitive Product. Where a Competitive Business is part of a larger business involving both competitive and non-competitive products, the terms of this Agreement shall apply only to that part of the business which involves the production, distribution, marketing or sale of a Competitive Product.

"**Competitive Product**" means any product or service, in existence, that competes, or is reasonably anticipated to compete, in the same markets with a product or service of the USI Companies, in existence, which Executive, Company or any USI Company has sold, marketed, distributed or developed in the last two (2) years of Executive's employment with the Company, or about which Executive has acquired Confidential Information.

"**Confidential Information**" means at any date, any information of a USI Company, that is not already generally available to the public (unless such information has entered the public domain and become available to the public through fault of the Party to be charged hereunder), including but not limited to: i) the identity, authority and responsibilities of key contacts and decision-makers employed by the Company's customers, active prospects and active and prospective broker referral sources; ii) the Company's customers' and active prospects' types,

2

EXHIBIT 1

terms and conditions of coverage and particularized insurance needs, requirements, risk specifications, preferences, expiration dates, claims and loss histories, and commission rates, fees and premiums; iii) the terms and conditions of the Company's customers' and active prospects' benefits and compensation plans; iv) information furnished to the Company in confidence by its customers, active prospects and active and prospective broker referral sources; v) the Company's and its corporate affiliates' business plans, marketing strategies, and pricing structure, criteria and formulae for insurance and benefits products and claims management, and unpublished financial data and statements; vi) lists of the Company's customers, prospects and active and prospective broker referral sources and any analyses and compilations thereof; vii) information that is password-protected; viii) any and all other proprietary information of a USI Company, including any information contained within a proprietary database; and ix) any and all other information that constitutes a trade secret under the governing trade secrets law.

"**Goodwill**" means the expectation of continued patronage from client accounts and new patronage from prospective clients based on the Company's investment in repeated contacts, business transactions, and other efforts to develop lasting customer relationships.

"**Net Commissions and Fees**" means all commissions and fees received and actually collected by the Company, specifically on a policy Coded to the Executive, less payments to external service providers such as, but not limited to vendors and value added service providers and/or other USI Companies and any sponsorships and/or charitable contributions made to a client by the Company, unless otherwise provided for by local USI practice. "Net Commissions and Fees" shall not include any overrides or profit-sharing; interest on premiums on deposit; or contingent, bonus, excess, supplemental, non-standard, annually computed, non-specific volume based, or any other similar commissions or fees.

"**Person**" means an individual, a partnership, a corporation, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, a limited liability company, or a governmental entity (or any department, agency, or political subdivision thereof).

"**USI Business**" means the businesses provided by any of the USI Companies, including, without limitation, the providing of insurance agency and brokerage, and related insurance services.

"**USI Companies**" or "**USI Company**" means USI, its subsidiaries (including the Company), and any entity under the control (as defined in Rule 12b-2 of the regulations promulgated under the Securities Exchange Act of 1934, as amended, without regard to whether any party is a "registrant" under such Act) of USI, and any of their successors or assigns.

## 2.    POSITION, RESPONSIBILITIES AND TERM

2.1.    *Executive's Position.*  On the terms and subject to the conditions set forth in this Agreement, the Company shall employ Executive to serve as President of the Company's Rental Program.  Executive shall report to the Company's Chief Executive Officer for USI Affinity, or his/her designee (hereinafter the "CEO").  Executive shall be a member of the USI Affinity Executive Committee.  Executive shall perform such services in the Company's offices and shall

3

EXHIBIT 1

do such traveling as may be reasonably required of Executive in the performance of Executive's duties. The Company agrees not to relocate Executive to an office that is more than 50 miles from Executive's location on the Effective Date.

2.2 *Executive's Responsibilities.* The Executive shall perform all duties customarily attendant to the position and shall perform such services and duties commensurate with such positions as may from time to time be reasonably prescribed by the CEO.

2.3 *No Conflicts of Interest.* Executive further agrees that throughout the period of Executive's employment hereunder, Executive will not perform any activities or services, or accept such other employment which would be inconsistent with this Agreement, the employment relationship between the Parties, or would interfere with or present a conflict of interest concerning Executive's employment with the Company; *provided*, that Executive shall be permitted to serve on the boards of directors of such other companies as the CEO shall approve, and that Executive may make personal investments and may act as a director and engage in other activities for any charitable, educational, or other nonprofit institution, as long as such investments and activities do not materially interfere with the performance of Executive's duties hereunder. Executive agrees to adhere to and comply with any and all business practices and requirements of ethical conduct set forth in writing from time to time by USI or the Company in employee manuals or other publications of USI or the Company.

2.4. *Term.* The term of this Agreement shall be deemed to commence on the Effective Date and shall continue until terminated in accordance with the provisions of Section 7 of this Agreement. The foregoing term of this Agreement and Executive's employment hereunder shall be referred to hereinafter as the "**Term**".

## 3. COMPENSATION

3.1. *Base Salary.* As compensation for the services to be rendered by Executive hereunder, the Company agrees to pay Executive, and Executive agrees to accept, a base salary ("**Base Salary**") during employment hereunder at the annual rate of $200,000; provided, however, that the CEO may determine to increase Executive's Base Salary in such amount as the CEO may determine, subject to the terms, conditions, and approvals required by USI's policies and procedures then in effect. The Base Salary shall be payable in equal installments by the Company according to its normal payroll practices.

3.2 *Performance Bonus.* From time to time during the Term hereof, Executive shall be eligible to receive, as additional compensation for the services to be rendered by Executive hereunder, a bonus ("**Bonus**") under the USI plan to be determined by the Company (the "**USI Plan**"). The Company shall have the right to change the USI plan under which Employee is eligible for a Bonus, and shall have the right to change the terms of any such USI Plan. Executive's initial performance bonus shall be 30% of the excess of the 2012 calendar year actual operating income over the 2012 calendar year projected operating income forecast of $1,750,000 for the Rental Specialties unit existing after the Closing of the transactions contemplated by the Asset Purchase Agreement. Any awards under the USI Plan will be determined by the USI CEO, subject to the terms, conditions and approvals required by USI's

4

EXHIBIT 1

policies and procedures then in effect. Any award under the USI Plan will be paid to the Executive no later than ninety (90) days following the end of the performance year; provided, however, that Executive shall not earn and therefore shall not be paid any such award unless Executive is still employed by the Company on the date such payment is due to be made. Such awards are dependent upon, among other things, the general financial performance of USI.

3.3 **Benefits.** Executive shall be entitled to the benefits which are afforded generally to similarly situated executive employees of the Company. Notwithstanding the foregoing, nothing contained in this Agreement shall require the USI Companies to establish, maintain or continue any of the group benefits plans already in existence or hereafter adopted for the employees of the USI Companies, or restrict the right of the USI Companies to amend, modify or terminate such group benefit plans in a manner which does not discriminate against Executive as compared to other executive employees of USI Companies.

3.4 **Paid Time Off.** Executive shall be entitled to paid time off (consisting of vacation, sick days and personal days ("PTO")) and holidays as are provided in general to similarly situated executive employees of the USI Companies, in accordance with usual practices and procedures. Without limiting the foregoing, unless otherwise required by law, Executive shall not be entitled to any additional compensation for any unused paid time off. Paid time off shall stop accruing once Executive has accumulated and not used the number of days to which he is entitled to in a year.

3.5 **Tax Withholdings.** There shall be deducted from all payments under this Agreement any taxes required to be withheld and/or paid pursuant to federal, state and local taxing authorities.

3.6 **Signing Bonus.**

(a) *Signing Bonus for Renewal Rates.* The Company shall pay Executive a signing bonus (the "**Renewal Rate Signing Bonus**") payable in three (3) equal installments of $71,654 on each of the following dates: (i) within 30 days of the Effective Date, (ii) on the first anniversary of the Effective Date, and (iii) on the second anniversary of the Effective Date.

(b) *Eligibility for Signing Bonus.* Executive must be actively employed by the Company on the dates the installments payments under Section 3.6(a) are due; provided, that, if Executive is terminated by the Company without cause, Executive shall be entitled to the installment payments on the applicable due dates as set forth in Section 3.6(a) above so long as Executive is not in breach of the restrictive covenants set forth in Sections 5 and 6 of this Agreement and provided that Executive executes and does not revoke a separation agreement and release of all claims against the Company and its related entities and persons, in form and content satisfactory to the Company. If Producer terminates this Agreement pursuant to Section 7.3 prior to the second anniversary of the Effective Date, Producer shall not be entitled to receive any further installment payments as set forth in Section 3.6(a). If Producer is in breach of Sections 5 or 6 of this Agreement at any time, any payments of the Signing Bonus received by Producer shall be repaid to the Company within 30 days of the breach

5

EXHIBIT 1

(c) *Independent.*  The Company agrees that the Renewal Rate Signing Bonus shall not be subject to performance criteria generally applicable to bonuses other than the conditions set forth in Section 3.6(b).

3.7  *Equity.*  (a) Subject to the Company's Board of Director approval, the Company shall offer Executive, at a time to be determined by the Company, the opportunity to invest $60,000 (the "**Investment Amount**") in the common stock of the Company's indirect parent, Compass Investors Inc. ("**Compass**") and, upon receipt of the Investment Amount, Compass shall issue common stock to Executive.

(b) Subject to the Company's Board of Director approval and upon completion of the investment described in Section 3.7(a), the Company shall cause Compass to issue $100,000 in value of Compass equity interest to Executive (fifty percent (50%) as restricted shares and fifty percent (50%) as stock options).

(c) The common stock, restricted shares, and stock options issued to Executive shall be subject to the Compass Key Employee Shareholders Agreement and other plan documentation.

3.8  *Commissions.*  (a) Executive shall be paid thirty percent (30%) of Net Commissions and Fees received by the Company on the Client Account of On the Move Inc. Executive's commissions shall be reduced by any return commissions.

(b) During the Term, the Company shall calculate commissions earned by Executive and received by the Company, no less than monthly.  Earned commissions shall be due and payable as soon as they can be reasonably calculated, but no later than thirty (30) days after the end of each calendar month.

(c)  If Executive's employment under this Agreement is terminated for any reason, including death, Executive's eligibility for any commissions shall end as of the effective date of termination.  The Company shall calculate commissions earned by Executive on commissions received by the Company prior to the date of the termination of Executive's employment. Earned commissions shall be due and payable as soon as they can be reasonably calculated but no later than sixty (60) days after the effective date of Executive's termination.  No further commissions shall be due and payable after such payment.

## 4.  EXPENSES

The Company shall reimburse Executive, in accordance with Company policy, as changed from time to time, for all expenses reasonably and properly incurred by Executive in connection with the performance of Executive's duties hereunder and the conduct of the business of the Company, upon the submission to the Company (or its designee) of appropriate vouchers.

## 5.  CONFIDENTIAL INFORMATION AND PROPERTY

5.1.  *Property of the Company.*  Executive acknowledges and agrees that all premiums, commissions, fees and other forms of compensation, and all Confidential Information

6

EXHIBIT 1

of the Company or USI Companies (determined as of any date during the Term), which Executive has access to, receives or generates in the course of providing, directly or indirectly, any USI Business during the Term hereof, shall be the sole property of the Company and shall remain with the Company upon termination of Executive's employment.

5.2.    *Confidentiality.*    The Company agrees to provide Executive with Confidential Information to assist Executive in the course and scope of Executive's duties.    Executive acknowledges that the Company's agreement to provide this Confidential Information to Executive is in consideration for, and ancillary to, Executive's agreement to the other terms set forth in this Agreement.

5.3.    *Confidentiality During and Following Term.*    During the Term hereof, and for a five (5) year period following the Term, Executive will not use, or disclose to any Person, any Confidential Information (determined as of any date during the Term hereof) of any USI Company, except (a) in the normal course of business on behalf of the Company (b) with the prior written consent of such USI Company or (c) to the extent necessary to comply with law or the valid order of a court of competent jurisdiction, in which event Executive shall notify such USI Company as promptly as practicable (and, if possible, prior to the making of such disclosure). In addition, Executive will use reasonable efforts to prevent any such prohibited use or disclosure by any other Person.

## 6.    NON-SOLICITATION, NON-COMPETITION AND NON-INTERFERENCE

### 6.1.    *Non-Solicitation*

(a) *Non-Solicitation of Clients and Active Prospective Clients.* On behalf of any Competitive Business, Executive shall not, without the Company's prior written consent, directly or indirectly:

(i)    (A) solicit, sell, provide or accept any request to provide insurance services in competition with the Company to any Client Account; or (B) consult for any Client Account with respect to insurance services in competition with the Company; or (C) sign or accept a broker of record letter with any Client Account; or (D) induce the termination, cancellation or non-renewal of any Client Account; and/or

(ii)    (A) solicit, sell, provide or accept any request to provide insurance services in competition with the Company to any Active Prospective Client; or (B) consult for any Active Prospective Client with respect to insurance services in competition with the Company; or (C) sign a broker of record letter with any Active Prospective Client.

(b) *Duration.* The restrictions set forth in Section 6.1(a)(i) shall apply throughout the Term hereof and thereafter until two (2) years after the effective date on which Executive is no longer employed, for any reason, by the Company or any USI Company, or its successors or assigns. The restrictions set forth in Section 6.1(a)(ii) shall apply throughout the Term hereof and thereafter until six (6) months after the effective date on which Executive is no longer employed,

7

EXHIBIT 1

for any reason, by the Company or any USI Company, or its successors or assigns. Executive agrees that (i) the duration of the non-solicitation obligations hereunder shall be extended by the period of time in which the Executive is in breach of those obligations and (ii) the extended duration shall be measured from the date of the court order granting injunctive relief.

6.2    *Non-Competition.*  In consideration of the payments and benefits to be received by Executive under this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by Executive, Executive agrees that, during Executive's employment with the Company or its successors or assigns, Executive will refrain from carrying on any business, for the benefit of Executive or another Person, which provides any USI Business in competition with the Company anywhere except (i) in the normal course of business on behalf of any USI Company during the term of Executive's employment under this Agreement or (ii) with the Company's prior written consent. Executive further agrees that, during the Non-Competition Period, Executive will refrain from carrying on any business, directly or indirectly, which provides any USI Business in competition with  the insurance business of USI Affinity.  The term "carrying on any business" shall mean to act as a sole proprietor, partner, member of a limited liability company, stockholder, officer, director, employee, manager, trustee, agent, advisor, joint venturer, or consultant of, with or to, any business, or otherwise to own, manage, operate, control or participate in the ownership, management, operation or control of, or engage in, any business. The Non-Competition Period shall mean the period beginning on the effective date of termination of Executive's employment with the Company or its successors or assigns, and ending six (6) months thereafter. It is expressly agreed that this Section 6.2 is not intended to restrict or prohibit the ownership by Executive of stock or other securities of a publicly-held corporation in which Executive (a) does not possess beneficial ownership of more than 5% of the voting capital stock of such corporation and (b) does not participate in any management or advisory capacity. In addition, it is also agreed that this Section 6.2 shall not prohibit Executive from serving as a director pursuant to the terms of Section 2.3 during the term of Executive's employment under this Agreement.

6.3.    *Non-Interference.*  Executive further agrees that Executive will not, directly or indirectly, solicit the employment, consulting or other services of, or hire, any employee of the Company with whom Executive worked or obtained knowledge about as a result of Executive's employment with the Company, or otherwise induce any of such employees to leave such USI Companies' employment or to breach an employment agreement therewith, in each case for employment or engagement by or with a Person engaged in competition with the Company. The restrictions contained in this Section 6.3 shall apply throughout the Term hereof and thereafter until two (2) years following the date on which Executive is no longer employed, for any reason, by the Company or any USI Company, or its successors or assigns.

6.4.    *Purpose of Restrictions.*  The Parties recognize and agree that Executive, as an integral part of performing Executive's duties under this Agreement, will actively participate in high level management discussions involving the proprietary business plans, core strategies and initiatives, and other trade secrets and Confidential Information of the Company and USI Companies, and the clients of the USI Companies. Accordingly, the purpose of the restrictions in this Sections 6.1, 6.2 and 6.3 are necessary is to protect the Company's assets and to prevent Executive or any Competitive Business from gaining an unfair advantage from the Executive's

8

EXHIBIT 1

knowledge of the Company's Confidential Information or misusing of the Company's Goodwill. The Executive further agrees that the time, geographic and scope limitations herein are reasonable and necessary to protect the Company's Confidential Information and Goodwill.

6.5.    *Miscellaneous.*  Without limiting the provisions of Section 16, in the event of any assignment by the Company permitted under such section, the restrictive periods contained in this Section 6 shall be determined by reference to the termination of Executive's employment with any permitted assignee of the Company.

6.6.    *Modification.*  If a court finds that any provisions of this Agreement exceed the time, geographic or scope limitations permitted by applicable law, the restrictions shall be reformed to the maximum time, geographic or scope limitations permissible. If a court refuses to enforce any term of these provisions, then the unenforceable terms shall be eliminated ("blue penciled") or modified to the extent necessary to permit the remaining terms to be enforced. The Parties agree that the Company may further limit the scope of these covenants to the extent it deems reasonable, and such limitation is effective upon notice to Executive. Asserting any claims against the Company will not relieve the Executive of his obligations under this Agreement or constitute a defense to its enforcement.

## 7.    TERMINATION

7.1    *Termination by the Company without Cause.*  Company shall have the right to terminate Executive's employment hereunder "with or without cause" by giving Executive written notice to that effect. Any such termination of employment shall be effective on the date specified in such notice. In the event of such termination without cause, the Company shall: (i) pay Executive his/her earned, but unpaid Base Salary through the effective date of termination pursuant to Section 3 of this Agreement; (ii) pay Executive any business expenses remaining unpaid on the effective date of the termination for which Executive is entitled to be reimbursed under Section 4 of this Agreement; (iii) pay Executive an amount per month equal to one-twelfth of Executive's then adjusted Base Salary for the period commencing on the date following the date of Executive's termination of employment and ending on date which is six (6) months following the effective date of Executive's termination; (iv) pay Executive an amount equal to the amount of commissions earned and payable as of the date of termination of employment under Section 3.8(c) of this Agreement; and (v) either continue to provide Executive with medical and dental healthcare coverage under the plan in which Executive participates immediately prior to the effective date of such termination (where Executive remains eligible to participate, and in accordance with the terms thereof) or in the event Executive no longer remains eligible to participate under such medical and/or dental healthcare plan, to reimburse Executive for the amount of the premium Company would have paid for Executive's medical and/or dental healthcare coverage had Executive remained employed hereunder, in each case until the earlier of (A) the date which is six (6) months following the effective date of termination or (B) the commencement of Executive's coverage under another employer's healthcare plan.

7.1.1    Without limiting any other remedy available hereunder, all payments and benefits described in Section 7.1, above, shall immediately terminate upon a judge's

9

EXHIBIT 1

determination that Executive has breached the provisions of Section 5 or 6 of this Agreement. Executive further understands and agrees that the Company's obligation to provide any severance payments or benefits, as set forth in Section 7.1, above, shall be contingent upon Executive executing and not revoking a separation agreement and release of all claims against the Company and its related entities and persons, in form and content satisfactory to the Company.

7.2 **Termination by the Company for Cause.** Company shall have the right to terminate Executive's employment hereunder "for cause" by giving Executive written notice to that effect. Any such termination of employment shall be effective on the date specified in such notice. In the event of such termination, the Company shall pay to Executive (a) his/her earned, but unpaid Base Salary through the effective date of the termination, and (b) any business expenses remaining unpaid on the effective date of the termination for which Executive is entitled to be reimbursed under Section 4 of this Agreement, and (c) an amount equal to the amount of commissions earned and payable as of the date of termination of employment under Section 3.8(c) of this Agreement. For the purpose of this Agreement, "for cause" shall mean (i) commission by Executive of a willful and material act of dishonesty in the course of Executive's duties hereunder, (ii) conviction of Executive by a court of competent jurisdiction of a crime constituting a felony or conviction in respect of any act involving fraud, dishonesty or moral turpitude, (iii) Executive's performance under the influence of illegal drugs or the abuse of legal drugs, or continued habitual intoxication, during working hours, after the Company shall have provided written notice to Executive and given Executive 30 days within which to commence rehabilitation with respect thereto, and Executive shall have failed to commence such rehabilitation or continued to perform under the influence after such rehabilitation, (iv) frequent or extended, and unjustifiable (not as a result of incapacity or disability) absenteeism which shall not have been cured within 30 days after the Company shall have advised Executive in writing of its intention to terminate Executive's employment in accordance with the provisions of this Section 7.2, in the event such condition shall not have been cured, (v) Executive's personal, willful and continuing misconduct or refusal to perform duties and responsibilities described in Section 2 above, or to carry out directives of the CEO, which, if capable of being cured, shall not have been cured within 60 days after the Company shall have advised Executive in writing of its intention to terminate Executive's employment in accordance with the provision of this Section 7.2 or (vi) material non-compliance with the terms of this Agreement, including but not limited to any breach of Section 2, Section 5 or Section 6 of this Agreement.

7.3 **Termination by Executive.** Executive shall have the right to terminate Executive's employment hereunder by giving the Company not less than thirty (30) days prior written notice to that effect. The termination of employment shall be effective on the date specified in such notice; provided, however, that upon receipt of such notice, the Company may, in its discretion, require Executive to cease working immediately, in which event, the termination of employment shall be effective thirty (30) days after issuance of the notice or such other date specified by the Company in its discretion. In the event of termination by Executive under this Section 7.3, Executive shall be entitled to receive the same payments as would be provided under Section 7.2 in the event of termination for cause.

7.4 **Death, Incapacitation or Disability.**

10

EXHIBIT 1

a.      *Death.* If Executive dies during Executive's employment hereunder, this Agreement shall terminate upon the date of Executive's death.  In the event of any such termination, the Company shall pay to Executive's representative or Executive's estate (i) any earned, but unpaid Base Salary through the effective date of termination pursuant to Section 3 of this Agreement, (ii) any business expenses remaining unpaid on the effective date of the termination for which Executive is entitled to be reimbursed under Section 4 of this Agreement, and (iii) an amount equal to the amount of commissions earned and payable as of the date of termination of employment under Section 3.8(c) of this Agreement.

b.      *Incapacitation or Disability.* In the event that Executive is incapacitated or disabled by reason of illness or physical or mental disability from performing Executive's duties hereunder with or without reasonable accommodation (which shall be deemed to have occurred (i) when Executive has become eligible for total disability benefits under the Company's long-term group disability policy, if any, or, if no policy is then in effect, (ii) when such incapacity or disability, as defined below, shall have existed for either (A) one continuous period of six months or (B) a total of seven months out of any twelve consecutive months), the Company shall have the right to terminate Executive's employment hereunder by giving thirty (30) days' written notice to Executive to that effect.  If Company terminates Executive pursuant to this paragraph, the termination of employment shall be effective on the date specified in such notice but in no event shall that date be sooner than the date determined under clause (i), or if no long term disability policy is in effect then the date determined in clause (ii).  In the event of any such termination, the Company shall pay Executive any earned, but unpaid Base Salary, through the effective date of termination pursuant to Section 3 of this Agreement, and any business expenses remaining unpaid on the effective date of the termination for which Executive is entitled to be reimbursed under Section 4 herein, and an amount equal to the amount of commissions earned and payable as of the date of termination of employment under Section 3.8(c) of this Agreement.  By way of clarification, nothing herein is intended to imply or state that salary or other compensation is due Executive for the period Executive is absent from work due to disability or incapacity. Except as specifically set forth in this Section 7.4 or otherwise required by law, Executive is not eligible for and will not be paid any Base Salary or other compensation during any period in which Executive is not actively employed, including but not limited to any period of incapacity, disability, or inability to perform his job duties with or without reasonable accommodation.  During any such period, Executive shall be limited to disability benefits, if any, to which Executive may be eligible.   Notwithstanding the other provisions of this paragraph, in no event may Executive be terminated under this section 7.4 earlier than any time allowed under applicable law.  For purposes of clause (ii), an Executive "disability" shall mean a physical or mental impairment which renders Executive unable to perform the essential functions of his position, even with reasonable accommodation which does not impose an undue hardship on the Company, and "incapacity" as in used clause (ii) shall be limited only to such disability which substantially prevents the Company from availing itself of the services of Executive.  The Company reserves the right, in good faith, to make this determination of incapacity or disability under clause (ii) based upon information supplied by Executive and/or his medical personnel, as well as information from medical personnel (or others) selected by the Company or its insurers.

11

EXHIBIT 1

7.5    *Miscellaneous Termination Provisions.*    Executive, upon termination of Executive's employment hereunder, hereby irrevocably promises to:

   a.    Return all property of the USI Companies in Executive's possession or within Executive's custody and control wherever located immediately upon such termination.

   b.    Participate in an exit interview with a designated person or persons of Company if requested by Company and identify any new employer or business engagement, and describe the nature of Executive's duties for that new employer or business engagement.

   c.    Provide each new employer with a copy of Sections 5 and 6 of this Agreement prior to taking a position with such new employer within two (2) years after Executive's termination of employment.

   d.    Not access or attempt to access the Company's internal or restricted premises, records, files, databases, networks, websites or communication, including email and voicemail.

   e.    Subject to obligations under applicable laws and regulations, not publicly make any statements or comments that disparage the reputation of any of the USI Companies or their senior officers or directors.

## 8.    REMEDIES

Executive acknowledges that the services to be rendered by Executive are of a special, unique and extraordinary character and that it would be extremely difficult or impracticable to replace such services, that the material provisions of this Agreement are of crucial importance to the Company and that any damage caused by the breach of Sections 5 or 6 of this Agreement would result in irreparable harm to the business of the Company for which money damages alone would not be adequate compensation. Accordingly, Executive agrees that if Executive violates Sections 5 or 6 of this Agreement, the Company shall, in addition to any other rights or remedies of the Company available at law, be entitled to equitable relief in any court of competent jurisdiction, including, without limitation, temporary injunction and permanent injunction. Executive agrees to waive any requirement for the Company to post a bond.

## 9.    EXECUTIVE'S REPRESENTATIONS AND WARRANTIES

9.1.    *General.* Executive represents and warrants to the Company that, to the best of Executive's knowledge and belief, Executive has previously supplied to the Company all agreements between Executive and any entity that has employed Executive in the last five years. Executive further represents that Executive's execution of this Agreement and the performance of Executive's duties as contemplated under this Agreement do not conflict with, and are not impaired by, any law, rule, regulation, or court order by which Executive is bound.

9.2.    *No Confidential Information.* Executive represents and warrants to the Company that Executive has not removed any confidential information from any prior employer,

12

EXHIBIT 1

and that Executive has no such confidential information in his possession or control in any form including electronic media, and that Executive will not use any such confidential information in the performance of his/her duties under this Agreement.

9.3. *No Copyright Materials.* Executive represents and warrants to the Company that Executive has not taken any copyrighted materials from any prior employer, that Executive has no such copyrighted materials in his/her possession, and that Executive will not use any such copyrighted materials in the performance of his/her duties for the Company.

9.4. *No Restrictive Sales Agreements.* Executive represents and warrants to the Company that, Executive is not and has not been subject to the provisions of any sales and purchase agreement entered into within the past ten years with any organization, individual or business entity that prevents or restricts Executive from competing with, or soliciting the clients, customers, business or employees (including, without limitation for the purposes of hiring such employees) of, such other organization, individual or business entity for any period of time or within any geographical area, whether heretofore expired or not.

9.5. *No Contacts with Clients of Former Employers.* Executive represents and warrants to the Company that, except as expressly disclosed to the Company, Executive has not made any contact with any clients of any former employer concerning Executive's prospective employment relationship and/or Executive's employment relationship with the Company, and that Executive will not, without the prior express direction of the CEO, solicit any clients of any former employer.

9.6. *No Contacts Regarding Future Employment with Employees of Former Employers.* Executive represents and warrants to the Company that, except as expressly disclosed to the Company, Executive has not and shall not make any contact with any employees of any former employer concerning their prospective employment relationship with the Company, without the prior express direction of the CEO.

9.7 *No Ownership Rights to Client Accounts.* Executive represents and warrants to the Company that Executive has no ownership rights to any client accounts of USI including, but not limited to, any client accounts of Sellers prior to the Closing.

## 10. INTELLECTUAL PROPERTY

Executive further agrees to assign without further consideration all intellectual property, including but not limited to inventions, discoveries or any material produced by Executive during the course of Executive's employment hereunder (including modifications or refinements of such materials) to the Company in their entirety. Such assignment and transfer is a complete and total assignment and transfer of any right Executive may have in such intellectual property and includes any patent, copyright, trade or service mark or the right to obtain any such patent, copyright, trade or service mark, and any trade secret rights in such material. This provision does not entitle Executive to any additional compensation, with such compensation, if any, being entirely within the discretion of Company.

13

EXHIBIT 1

## 11. ENTIRE AGREEMENT; NO RELIANCE; NO AMENDMENT

No agreements or representations, oral or otherwise, express or implied, have been made by either Party, with respect to Executive's employment by any USI Company that are not set forth expressly in this Agreement. Executive expressly disclaims any reliance on any statement or representation made by any Party or third party in entering into this Agreement, except for those expressly set forth herein. This Agreement supersedes and cancels any prior agreement entered into between the Parties regarding Executive's employment with the Company. Except as provided in Sections 6.6 or 15 herein, no amendment or modification of this Agreement shall be valid or binding unless made in writing and signed by the Party against whom enforcement thereof is sought.

## 12. NOTICES

All notices, demands and requests of any kind which either Party may be required or may desire to serve upon the other Party hereto in connection with this Agreement shall be delivered only by courier or other means of personal service, which provides written verification of receipt, or by registered or certified mail return receipt requested (each, a "Notice"). Any such Notice delivered by registered or certified mail shall be deposited in the United States mail with postage thereon fully prepaid or if by courier then deposited with the courier. All Notices shall be addressed to the Parties to be served as follows:

(a)  If to the Company, at:

USI Affinity
One International Plaza, Suite 400
Philadelphia, PA 19113
Attn: CEO

Copy to:

USI Holdings Corporation.
555 Pleasantville Road
Briarcliff Manor, NY 10510
Attn: General Counsel

(b)  If to Executive, at
Executive's most current address within Company records

Either of the Parties hereto may at any time and from time to time change the address to which notice shall be sent hereunder by notice to the other Party given under this Section. All such notices, requests, demands, and other communications shall be effective when received at the respective address set forth above or as then in effect pursuant to any such change.

## 13. WAIVERS

14

EXHIBIT 1

No waiver of any default or breach of this Agreement shall be deemed a continuing waiver or a waiver of any other breach or default.

## 14. GOVERNING LAW

This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to principles of conflicts of law.

## 15. SEVERABILITY

The provisions of this Agreement are intended to be interpreted in a manner which makes them valid, legal, and enforceable. In the event any provision of this Agreement is found to be partially or wholly invalid, illegal or unenforceable, such provision shall be modified or restricted to the extent and in the manner necessary to render it valid, legal, and enforceable. It is expressly understood and agreed between Executive and the Company that such modification or restriction may be accomplished under Section 6.6 or by mutual accord between the Parties or, alternatively, by disposition of an arbitrator or a court of law. If such provision cannot under any circumstances be so modified or restricted, it shall be excised from this Agreement without affecting the validity, legality or enforceability of any of the remaining provisions.

## 16. ASSIGNMENT

Executive may not assign any rights (other than the right to receive income hereunder) under this Agreement without the prior written consent of the Company. Executive's obligations under this Agreement inure to the Company, its successors and assigns. The Company may, at any time and without Executive's further approval or consent, assign or transfer this Agreement, by merger, asset sale or otherwise, to any subsidiary, affiliate, purchaser, acquirer or other assignee or successor with which Executive may become employed. Any such successor or assign is expressly authorized to enforce the terms of this Agreement.

## 17. SURVIVAL

For the avoidance of doubt, the provisions of Sections 5, 6, and any other ongoing duties of the parties hereto shall survive termination or expiration of this Agreement.

## 18. THIRD PARTY BENEFICIARIES

Executive and Company agree that the USI Holdings Corporation, and its successors and assigns, are third party beneficiaries of this Agreement, and expressly agree that the restrictive covenants contained in Section 6 of this Agreement, and the confidentiality provisions in Section 5 of this Agreement, are intended for the benefit of such Persons as well as for the Company's benefit.

## 19. TAX CONSEQUENCES

15

EXHIBIT 1

There shall be deducted from all payments and benefits under this Agreement any taxes required to be withheld and/or paid pursuant to federal, state and local taxing authorities. Notwithstanding anything in this Agreement to the contrary, the Company does not guarantee the tax treatment of any payments and benefits under this Agreement, including without limitation pursuant to the I.R.S. Code or any other applicable federal, state or local law and any guidance issued thereunder. Executive acknowledges that he has consulted with counsel of Executive's own choosing on all issues relating to this Agreement, including the tax treatment of all payments and benefits and I.R.S. Code Section 409A.

## 20.    ADJUSTMENT OF AGREEMENT FOR 409A

20.1    For purposes of the application of Treas. Reg. § 1.409A-1(b)(4)(or any successor provision), each payment in a series of payments to Executive will be deemed a separate payment

20.2    Notwithstanding any other provision of the Agreement to the contrary, any payment or benefit provided to the Executive upon or following Executive's termination of employment that represents a "deferral of compensation" within the meaning of section 409A of the Code shall only be paid or provided to Executive upon Executive's "separation from service" within the meaning of Treas. Reg. § 1.409A-1(h) (or any successor regulation). To the extent compliance with the requirements of Treas. Reg. § 1.409A-3(i)(2) (or any successor provision) is necessary to avoid the application of an additional tax under section 409A of the Code to payments due to the Executive upon or following Executive's "separation from service", then notwithstanding any other provision of the Agreement (or any otherwise applicable plan, policy, agreement or arrangement), any such payments that are otherwise due within six months following Executive's "separation from service" will be deferred (without interest) and paid to the Executive in a lump sum immediately following that six month period. This provision shall not be construed as preventing payments to Executive pursuant to a "separation pay plan" that meets the requirements of Treas. Reg. § 1.409A-1(a)(9) upon or following Executive's "separation from service" equal to an amount up to two (2) times the lesser of (a) Executive's annualized compensation for the year prior to Executive's "separation from service", and (b) the maximum amount that may be taken into account under a qualified plan pursuant to section 401(a)(17) of the Code, being paid to Executive in the first six months following Executive's "separation from service."

20.3    Notwithstanding anything in this Agreement to the contrary, it is the intention of the Parties that, to the extent applicable, this Agreement comply with I.R.S. Code Section 409A and any guidance issued thereunder, and this Agreement and the payment of any benefits hereunder shall be interpreted, operated and administered accordingly. The Parties agree that if, as of the date hereof, additional guidance is issued by the U.S. Treasury Department and/or the Internal Revenue Service that may impact this Agreement with respect to I.R.S. Code Section 409A, the Parties will cooperate and negotiate in good faith to adjust this Agreement (if necessary) and the payments and benefits hereunder to comply with I.R.S. Code Section 409A and such guidance (but without additional consideration being provided to Executive) so as to avoid the imposition of any additional taxes, penalties or costs.

16

EXHIBIT 1

## 21.    COUNTERPARTS

This Agreement may be executed in one or more counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument. Signature pages may be detached from multiple separate counterparts and attached to a single counterpart so that all signature pages are physically attached to the same document.

## 22.    HEADINGS

The headings of the several sections and subsections of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

## 23.    CONSTRUCTION OF AGREEMENT

All Parties agree that this Agreement shall be construed in such a manner so as not to favor one party or the other regardless of which party has drafted this Agreement.

## 24.    REVIEW OF AGREEMENT

Executive acknowledges that he has been given a copy of this Agreement and has been provided ample time and opportunity to review this Agreement and understand its contents and to have it reviewed by any legal, financial or accounting advisor of his choice. Executive represents and warrants that he has read and understands this Agreement, has full authority to perform the duties hereunder, and will not be in breach or violate any other legal or fiduciary obligations by entering into or performing under this Agreement.

EXHIBIT 1

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed and effective as of the date first described above.

USI INSURANCE SERVICES LLC

By:

Name:

Title:

EXECUTIVE

Name:  Brian Hall

18

EXHIBIT 1